Christopher M. BOWMAN, Plaintiff,

v.

The CITY OF MIDDLETOWN, the County of Orange, the City of Middletown Police Department, Detective James Gillespie, Police Officer Anthony Lucarelli, a Number of, As Yet, Unidentified Individual Police Officers, Middletown Mayor Joseph M. De Stefano, County Executive Joseph G. Rampe and Superintendent of Orange County Jail, Theodore Catletti, Defendants.

No. 99 Civ.0996(CM)(GAY).

United States District Court, S.D. New York.

April 4, 2000.

Paul J. McAllister, New York City, for Plaintiff.

Michael A. Miranda, Miranda & Sokoloff, New York City, for Defendant James Gillespie.

David L. Posner, McCabe & Mack, Poughkeepsie, NY, for Defendant Anthony Lucarelli.

George K. DeHaven, Rivkin Radler & Kremer, Uniondale, NY, for Middletown Defendants.

Richard B. Golden, Susan Z. Stockburger, Office of the Orange County Attorney, Goshen, NY, for County Defendants.

MEMORANDUM ORDER AND DECISION GRANTING MOTIONS FOR SUMMARY JUDGMENT OF MIDDLETOWN AND ORANGE COUNTY DEFENDANTS AND GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT OF DEFENDANTS GILLESPIE AND LUCARELLI

McMAHON, District Judge.

On the morning of February 14, 1998, officers of the Middletown Police Department were advised of a series of robberies that occurred during the night, and were further informed that one of those robberies had resulted in a homicide. Later that morning, uniformed patrols received a call to report to Tuckerman Hall, a psychiatric facility in Middletown, on a report that an individual with blood on his person had entered the premises. That individual was Plaintiff Christopher Bowman. Several detectives approached Bowman, and he accompanied them to the station house for questioning. After being questioned for 40 minutes, Bowman confessed to the crimes. Later that day, he signed a detailed eight-page statement. Bowman was thereupon incarcerated in the Orange County Jail, where he remained for 19 days.

In the days following Bowman's incarceration, the detectives discovered that Bowman's confession statement was inconsistent with the facts surrounding the crimes, and were unable to obtain any physical evidence to implicate Bowman. A grand jury declined to issue an indictment against Bowman, and he was released from prison. Middletown police ultimately charged another individual, Anthony Grayson, who was convicted of the crimes in January 1999.

Bowman brings claims under 42 U.S.C. §§ 1983, 1985, and 1986 for violations of his rights under the First, Fourth, Fifth, Eighth, and Fourteenth Amendments of the U.S. Constitution, against Middletown Detectives James Gillespie and Anthony Lucarelli; the City of Middletown, the Middletown Police Department, and Middletown Mayor James DeStefano ("the Middletown Defendants"); [1] the County of Orange, Orange County Executive James Rampe, and Orange County Jail Superintendent Theodore Catletti ("the County Defendants"). Specifically, Bowman alleges as to each Defendant (1) false arrest, (2) false imprisonment, (3) malicious prosecution, and (4) conspiracy to deprive him of constitutional rights during his incarceration in the Orange County Jail.

All Defendants have moved for summary judgment. Their motions are disposed of as follows: the motions of Defendants Gillespie and Lucarelli are denied as to the false arrest claims, and granted with respect to the other three claims; the motions of the Middletown and County Defendants are granted in their entirety.

### FACTS

*(1) Events Leading up to Bowman's Arrest*

During the early morning hours of February 14, 1998, several homes around Middletown were robbed. In the course of those robberies, the perpetrator stabbed four people and killed one of them, 67 year-old Molly Cosgrove.

On the previous day, Plaintiff Bowman had been released from the Orange County Jail, after serving a six-month term for petty larceny. (Deposition of Christopher Bowman at 5, attached as Exhibit C to Notice of Motion of Defendants City of Middletown, Middletown Police Department, and Joseph DeStefano.) Bowman arrived in Middletown at approximately 9:30 a.m., whereupon he purchased and drank a bottle of rum; purchased and smoked a "nickel bag" of marijuana; shoplifted certain unidentified items from a K-Mart in Wallkill, New York; sold the shoplifted items for approximately $50; spent most of that money on crack cocaine, which he then smoked; smoked a joint of marijuana; and at approximately 6 p.m., went to the police station seeking shelter for the night. (Bowman Dep. at 10, 11, 14, 15.) Upon the recommendation of a social worker, Bowman sought emergency housing at the Middletown Psychiatric Center ("MPC"), where he was admitted and spent the night. (Id. at 18–19.) Bowman left the emergency housing facility at 6:30 a.m. on February 14, and shortly thereafter, in what Bowman describes as an attempt to gain admission to Tuckerman Hall, the psychiatric hospital at MPC, slit his wrist using a razor provided to him at the emergency housing facility, for the purpose of convincing the staff at Tuckerman Hall that he was suicidal. (Id. at 21.) Bowman was told by a staff member to wait while a doctor was summoned.

Gillespie testified that he received a phone call at home at about 5 a.m. that

---

1. Bowman improperly named the Middletown Police Department as a Defendant in this action. It is well settled that in a suit alleging deprivation of constitutional rights by an agency of a municipality, such as a police department, the municipality, not the agency, is the real party in interest, and the proper named party in the action. *See Manning v. County of Westchester,* No. 93 Civ. 3366, 1995 WL 12579, *2 (S.D.N.Y. Jan.5, 1995); *Wilson v. City of New York,* 800 F.Supp. 1098, 1101 (E.D.N.Y.1992). Bowman's claims against the Middletown Police Department are therefore dismissed.

morning from a Dispatcher Brighton. (Deposition of James Gillespie at 6, attached as Exhibit E to Notice of Motion of Defendants City of Middletown, Middletown Police Department, and Joseph DeStefano.) He responded to the Middletown station house, where he was briefed by a Lieutenant Napoli. Gillespie learned that numerous homes had been broken into around Middletown. (Id. at 7–8.) At his deposition, Gillespie testified that the Lieutenant described the perpetrator as a black male wearing a dark coat. (Id. at 8.) However, at the trial of Anthony Grayson, the individual later charged with the crimes, Gillespie testified that the suspect was described as a "black male wearing a navy jacket with a wool hat." (Trial Transcript of James Gillespie at 817, Plaintiff's Exhibit 1.) This, as will be seen, is but the first of several inconsistencies (some of them glaring) between Gillespie's testimony at his deposition and at Grayson's trial.

Lucarelli testified that he arrived at the station house at about 7:30 a.m. At approximately 8 a.m., a supervisor briefed him on the events of the previous night. (Deposition of Anthony Lucarelli at 6–7, attached as Exhibit D to Notice of Motion of Defendants City of Middletown, Middletown Police Department, and Joseph DeStefano.) The detectives were given a composite sketch of the possible suspect, told where the homicide occurred, and informed that there were several other incidents in the area. Lucarelli was unable to recall the physical description of the suspect that he had been given. (Id. at 10–11.) Certain officers were given specific duties with respect to the investigation; Lucarelli was not. Rather, he was instructed to go out on patrol and assist where needed and to try and locate the suspect. (Id. at 8.)

Gillespie drove around Middletown alone in an unmarked car in search of the suspect. (Gillespie Dep. at 8.) He proceeded to the shelter where Bowman had stayed the night before and interviewed two supervisors, Gwen Heims and Jill Jackson. The supervisors exchanged a laugh and explained to Gillespie that they had refused admittance the night before to an individual named Christopher Bowman. (Id. at 12–13.) Ms. Hines then went upstairs, but, within minutes, came back downstairs and told Gillespie that she was wrong about Bowman, and that Bowman in fact had been allowed to stay at the facility. Hines then erroneously described Bowman as a white male. (Supplemental Report of Detective James Gillespie, attached as Exhibit E to Declaration of Michael A. Miranda.)

Gillespie then received a call over the radio for uniformed patrols "to investigate a black subject who had entered into Tuckerman Hall with blood on him." (Trial Transcript of James Gillespie at 780, Plaintiff's Exhibit 1.) At his deposition, Gillespie stated that he and Lucarelli arrived on the scene (in separate cars) at about the same time and encountered Bowman at about 10:00 a.m. (Gillespie Dep. at 15.)

Gillespie has given inconsistent testimony with respect to Bowman's appearance at Tuckerman Hall. At his deposition, Gillespie testified that Bowman was wearing a "dark windbreaker-type jacket." (Gillespie Dep. at 17.) At the Grayson trial, however, Gillespie described Bowman's outerwear as "a light windbreaker, gray with, I believe, the color of blue in it." (Gillespie Tr. at 816.) Gillespie also testified at the trial that, when he first encountered the Plaintiff, Bowman was wearing neither a navy jacket nor a hat. Indeed, he swore that the only thing that led him to view Bowman as a suspect was that Bowman was a black male. (Id. at 817–18.)

In his trial testimony, Gillespie also recalled that Bowman "had a very thin build, small stature," and estimated Bowman's weight at 145 pounds, and testified that Bowman did not match the description of the perpetrator that he had been provided. (Id. at 820.) However, the contemporaneous arrest report, on which Gillespie is listed as the complaining witness, described Bowman as 5 feet, 11 inches in

height, 205 pounds, and of medium build. (Bowman Arrest Report, attached as Exhibit I to Notice of Motion of Defendants City of Middletown, Middletown Police Department, and Joseph DeStefano.)

Lucarelli left the station house alone in a patrol car and began driving around Middletown's First Ward, where the crimes occurred. (Lucarelli Dep. at 8–9.) After driving by some of the crime scenes on Cottage Street, he received a call over the police radio instructing officers to proceed to Tuckerman Hall on a report from one of Tuckerman Hall's safety officers that someone matching the police description had entered the facility. Lucarelli believes that the report also mentioned that the suspect was bleeding. The detective spotted Bowman within seconds of walking into the entryway at Tuckerman Hall. (Id. at 12.) When Lucarelli encountered Bowman, Bowman was bleeding, and Gillespie was tending to Bowman's wound. (Id. at 13.)

According to Lucarelli, Gillespie asked Bowman to accompany the detectives to the station house. (Id.) This is the point at which Bowman contends that he was falsely arrested. The facts surrounding this encounter are in dispute. Gillespie testified that one of the detectives asked Bowman

> to follow us down to the car, which he complied. Our focus at that point was to speak to him and give him first aid, and I told him that we would take care of his injury and to follow me down to the car. He acknowledged by shaking his head yes, and then the three of us walked down to the police car. (Gillespie Dep. at 15.)

Lucarelli gave a similar account, stating, "We didn't place him in the vehicle. We asked him if he would accompany us voluntarily to police headquarters so we could talk about something. He entered my patrol car." (Lucarelli Dep. at 13.) Lucarelli did not tell Bowman that he had to go with the detectives; nor did he tell Bowman that he did not have to accompany them. (Id. at 31.) Gillespie testified that Bowman got into the car on his own, after which Gillespie read him his *Miranda* rights. (Gillespie Dep. at 15, 19.) The detectives rode back to the station house together in Lucarelli's car. (Lucarelli Dep. at 13.)

Bowman's account of the encounter, however, differs markedly from that of either detective:

> A. [A staff member at Tuckerman Hall] kept on saying, wait a minute, wait a minute, a doctor's coming, a doctor's coming. The next thing I know, a Middletown detective was standing right behind me along with Middletown—City of Middletown police officers.
>
> . . .
>
> Q. What did they say to you at that point?
>
> A. They said, "We were looking for you."
>
> Q. Okay. What did you say?
>
> A. I told them, "Looking for me for what?"
>
> Q. Okay. Just tell me the entire conversation.
>
> A. They called paramedics and they came, looked at my arm, wrapped it up and told them—specifically told them have me in the hospital within two hours. After they left, they took me outside the hospital, put me in the detective's car and they took me downtown.
>
> Q. Were those three police officers there at the time? Did all three of them go in the car?
>
> A. Yeah. (Bowman Dep. at 22–23.)

Bowman further testified that he was handcuffed when he entered Lucarelli's car. (Id. at 27.) When asked whether the detectives told him that he was under arrest, Bowman responded, "Yeah. I'm sure they did, yeah." (Id.) With respect to *Miranda* warnings in the car, Bowman testified, "I can't recall if they did or did not [Mirandize me]. I don't think they did." (Id.) Bowman also claims that he

told the detectives that he wanted an attorney present. (Id. at 26.)

Immediately after leaving Tuckerman Hall, the detectives radioed headquarters to make arrangements for paramedics to meet them at the station house. (Lucarelli Dep. at 17.) Lucarelli claims that the paramedics met the detectives upon their return to the station house at approximately 10:00 a.m., treated Bowman's injury, and advised them that Bowman would have to be taken to the hospital for sutures, but that there was "no urgency." (Id. at 21.) Lucarelli recalls that the paramedics finished tending to Bowman at sometime between 10 and 10:45 a.m. The detectives then escorted Bowman to an interview room and bought him breakfast. (Bowman Dep. at 24.)

Bowman was given *Miranda* warnings upon arrival at the station house, and initialed each of the warnings on a written "Miranda" card. (Bowman Dep. at 86–87.) At this point, Gillespie and Lucarelli were the only detectives with Bowman in the interview room. Neither of the detectives told Bowman why he was being questioned. Gillespie began the questioning by asking Bowman whether he had left the shelter during the night before; Bowman responded that he had been at the shelter all night long and had not left. (Lucarelli Dep. at 23.) Gillespie also asked Bowman whether he had stayed at the shelter, what he had been doing with himself since he left jail, and whether Bowman had used drugs. Lucarelli found it obvious from Bowman's behavior that Bowman had a drug problem. (Id. at 56.)

Gillespie claims that Bowman did not become agitated in his presence at any point during the interview. (Gillespie Dep. at 27.) Lucarelli, however, testified that at some point during Gillespie's questioning, Bowman did become agitated, which Lucarelli discerned when Bowman broke eye contact, raised his voice, and shuffled around in his seat. (Lucarelli Dep. at 27.) However, Lucarelli denied that Gillespie was shouting at Bowman. (Id.)

After the questioning had continued for roughly 40 minutes, Lucarelli, seeing that Bowman was "getting agitated" by Gillespie's questions,

> "jump[ed] in to just calm him down a bit ... I would start to just let Mr. Bowman know that—because he had spoke of some drug use, that I knew a little bit about drug abuse from having dealt with some people who had problems in that. I realized that sometimes people do things they regret, et cetera, et cetera. I didn't suggest anything that he did, but I just started to talk to him about it, and it calmed him down, and I said I could understand some things that Detective Gillespie couldn't understand, and it seemed to have a calming effect." (Id. at 29.)

Lucarelli also acknowledged telling Bowman that "people do[ ] things under the influence of drugs while they are in a blackout condition," prompting Bowman to respond, according to Lucarelli, "Maybe I did leave [the shelter] and I just don't remember." At that point, which, by Lucarelli's calculation, was between 10:20 and 10:35 a.m., Gillespie left the room, leaving Lucarelli alone with Bowman. Gillespie stated that his reason for leaving the room was to let his superiors know that Bowman had changed his story. (Gillespie Dep. at 26–27.) Lucarelli then said something to the effect of, "Sometimes [people under the influence of drugs] regret things and they do remember them, and you do remember, don't you? You know we have a job to do and we know everything that happened last night." (Lucarelli Dep. at 34.) Bowman then told Lucarelli that he left the shelter and went into a house, where he encountered a woman and demanded money from her, that the woman was hysterical, and that he stabbed her "until she shut up." (Id. at 38) Lucarelli estimated that he was alone with Bowman for "[p]robably less than ten minutes." (Id. at 36.)

Gillespie then re-entered the room, and Lucarelli told him that Bowman had admitted to hurting somebody the night before and wanted to talk to the detectives and "clear everything up and get things off his chest." (Id. at 38.) Gillespie testified that he shook Bowman's hand and said, "Thanks for your honesty;" Lucarelli recalled Gillespie's words as "You know you are doing the right thing." (Gillespie Dep. at 35; Lucarelli Dep. at 38.) Lucarelli also remembered that at some point before he left the room, Bowman said, "Well, if I didn't do this, you guys are going to owe me an apology." (Lucarelli Dep. at 34–35.) The time at this point was around 10:30 to 10:45 a.m, roughly forty minutes after the interview began. Lucarelli remained in the room "for a short period of time" as Bowman started to provide more details about the crimes, but soon thereafter, either Detective DeRosa or Lieutenant Byrne asked him to leave. Lucarelli assumed that he was asked to leave because his superiors wanted only two detectives in the room at that point, and because Lucarelli was in uniform, which might make Bowman feel uncomfortable while he was giving a statement. (Id. at 47.)

Bowman disputes the detectives' versions of the questioning. He testified that after the questioning began, the detectives told him, "If you don't—If you don't tell us you did it, we're gonna also bring up—We're gonna—We're gonna bring up other charges and stuff." (Bowman Dep. at 28–29.) He further stated that the detectives persisted in making similar threats over the course of four to five hours, and told him that a witness had seen him sneak out of the shelter. (Id. at 30.) Bowman described the subsequent questioning as follows:

Q. Did [the detectives] say anything to you while you were in the office?
A. Kept on saying, "You have something to tell us?" And I said, "No, I don't have nothing to tell you," and, you know, Lucarelli came to me, it came out of his mouth, he said, "Come on Bow-

man, we know you did it." I said, "Did what?" He kept on saying, "Come on Bowman, we know you did it." I'm like, "What?" They just kept talking and talking and talking, hours and minutes and hours passing by. I'm still trying to figure out what I did. I kept going, "I don't know what you're talking about. I don't know what I did." (Bowman Dep. at 25–26.)

Bowman testified that he then told the detectives again that he wanted an attorney present, but that Lucarelli and another, unidentified detective, told him that he could not have an attorney. Lucarelli did not recall hearing Bowman tell the detective that he wanted to leave, and claims that Bowman did not appear to want to leave. (Lucarelli Dep. at 41.) Bowman also claimed that a detective referred to by his colleagues as "Mickey Mouse" yelled at him, "If you don't give me a statement, I'm gonna—something about some homicide that happened two years ago and ten years ago ... 'You want to get charged for that all that other stuff,' I'm like, 'I don't know what you're talking about.'" (Bowman Dep. at 36.) Nonetheless, "Mickey Mouse" continued to accuse him and pressed Bowman to make a statement. Bowman again refused, restating his innocence. After about fifteen or twenty minutes of Lucarelli's urging, Bowman testified that "I was fed up" and agreed to confess. He stated that Lucarelli supplied the factual details contained in his statement, and, prodded by continued accusations from the detectives, signed the confession. (Id. at 42–44.)

At 1:10 p.m., one of the detectives (the record does not indicate which one) began taking down Bowman's statement. (Statement of Christopher Bowman, attached as Exhibit F to Notice of Motion of Defendants City of Middletown, Middletown Police Department, and Joseph DeStefano.) The statement was written by one of the detectives in Bowman's presence. (Bowman Dep. at 46.) The statement relates, with a high degree of detail, Bowman's

activities after being released from prison the day before. Bowman stated that after he had eaten a meal at the shelter, he "started to hear voices" telling him to get more crack. To that end,

> I decided before I left emergency housing I was going to break into houses ... I had a 007 type knife in my jacket pocket for protection. The knife had a brown wood handle and it was 7 to 8 inches long when it was open. I remember walking 20–25 minutes before I found one I wanted to break into. The house looked middle class rich so I decided to hit the house.... I decided to force open a door with my left shoulder. I remember running into an older woman in the dining room. I remember her asking me what do you want. I said I'm going to fucking rob you. I then went off and I started to stab this woman with the knife I had in my hand. This knife was in my hand when I first pushed the door in.... I stabbed the lady several times in the upper chest area and neck area. I remember her saying oh my God please don't kill me. I said shut the fuck up. I don't give a fuck. This woman fell to the floor. I checked her hand for jewelry and I saw a ring.... I put the ring in one of my pockets ... and I found money and jewelry from one bedroom dresser. I put the money (less than $200) and jewelry (necklaces—bracelets—watch—and rings) into my pockets.

> I started to head down the stairs and I remember seeing another person. I'm not sure if they were a male or female but he/she was in their 30s. I remember swinging my knife hand at this other person. But I don't know if I cut or stabbed them. On that house I remember seeing a big fish tank with a light on. I also remember seeing a small dog when I first went up on the old woman.

Lucarelli could not remember whether Bowman or one of the detectives had supplied the details of the fish tank and the dog, and he was unsure as to whether Bowman or one of the detectives was the first to mention that the victim had been stabbed in the chest and neck. (Lucarelli Dep. at 52, 54.)

The statement went on to describe Bowman's breaking into a second house, again using his left shoulder, and confronting a male in his 30s, who "put up a good fight but I took him out." The statement also describes Bowman as having left that house with $500, and goes on to note that Bowman "did about 5 or 6 more houses," where he "would beat or stab anyone who got in [his] way." The confession further states that following the string of break-ins, Bowman returned to emergency housing. Bowman signed the statement at 4:15 p.m.

Gillespie acknowledged knowing at the outset of the interview that money and jewelry "might have been" among the stolen items, and that he had been inside one of the houses that had been robbed. He denied, however, any familiarity with the interior of the house where the homicide occurred, (Gillespie Dep. at 46), though he also testified that Detective DeRosa provided Bowman with the detail of the dog in one of the victims' homes. (Gillespie Tr. at 833.) Lucarelli claims that no one gave him any investigatory details while he was questioning Bowman. (Lucarelli Dep. at 41.) In any event, many of the details provided in Bowman's statement turned out to be wrong: Bowman stated that he had entered the first house through a back window, when in fact the perpetrator had entered that house through the front door; Bowman claimed that he had assaulted a male victim after stabbing the homicide victim, when the second individual injured was actually a woman; Bowman said that he woke a white male with a beard in the second house, but no such victim existed; that he assaulted and took $1,000 from the man with the beard, when no home had been robbed of $1,000. (Gillespie Tr. at 826–27.) Additionally, none of homes involved were located on the streets that Bowman provided as crime scenes. There

were at least six other facts in his statement that turned out to be erroneous. (Id. at 827–31.)

Lucarelli, Gillespie, and a Detective Mishk then took Bowman on a drive around Middletown after Bowman agreed to identify the crime scenes and a location where he claimed to have dropped the knife he used to commit the homicide. No evidence was found at any of those locations. (Gillespie Tr. at 821–22.)

At some point during that ride, Bowman complained about his wrist, at which point the detectives brought him to the emergency room, where he was admitted at 5:45 p.m. (Patient Information Form, attached as Exhibit H to Lucarelli Notice of Motion.) Bowman was transported to the Orange County Jail later that evening. The record does not indicate whether Bowman was arraigned.

After Bowman was incarcerated, Lucarelli did not interview anyone at or seek physical evidence from the shelter. Lucarelli did not learn about the inconsistencies between the actual facts and the facts as related by Bowman until several days afterward, when he heard that the photo lineups "weren't panning out and some of the other stuff was inconsistent." (Lucarelli Dep. at 50.) Gillespie conducted a follow-up investigation, and recalled being provided with Bowman's bed linen from the shelter. (Gillespie Dep. at 44.) He claims that he went back to the shelter five or six times to interview personnel. Among his interview subjects was the staff member responsible for doing nightly bed checks, who told Gillespie that no males had been missing when he did his check, though it is not clear when the bed check was performed. (Id. at 47–48.) Gillespie was also told that all of the shelter's doors were locked on the night of February 13, and that once Bowman was admitted, he could not have gotten out during the night. (Id. at 48, 53.) But Gillespie also testified that he found "easy access" to the shelter through various entryways. (Id. at 48.) Gillespie had a vague recollection that

some people told him that Bowman never left the shelter that night, but he could not recall any of their names. (Id. at 58.)

Sometime on the morning of February 14, Cal Sirois, of the Middletown Taxi Service, came to the station house to report that he had driven home an individual who matched the description broadcast over the police band. Neither Gillespie nor Lucarelli ever spoke with Sirois. Gillespie testified that he did not learn about Sirois' report until the Grayson trial; Lucarelli stated that he was unaware of the tip until "much later." (Gillespie Dep. at 30–31; Lucarelli Dep. at 60–61.) The record reflects that Middletown Detectives Mishk, Wagner, and Schuh, as well as a New York State Police Investigator Figueroa, spoke with Mr. Sirois. Sirois told Schuh that he took a fare from an unidentified bus stand to 239 Pine Street in Wurtsboro. Sirois was shown a photo array that included Grayson, but did not recognize him. (Police Reports on Sirois lead, attached as second Exhibit A to Lucarelli Notice of Motion.) On March 4, Sirois gave a statement to Schuh describing his passenger as follows:

> Black male, I think he had a mustache and a goatee, but I'm not positive. He had short notty hair, his face was kind of skinny. He was probably about 6' 4", medium build. He was wearing white sneakers .... He was generally clean, but he smelled really bad because of the alcohol that he smelled from. His jacket was blue with a white "X" on each elbow.... He looked as though he had been out all night partying. He looked real tired and run down, like he couldn't wait to go to bed. He obviously hadn't showered; he had body odor and bad breath. I was checking to see if his pants were wet, because the money he paid with was wet and I was wondering if he had pissed in his pants. (Id.)

Figueroa's report indicates that Schuh reinterviewed Sirois on March 6; Sirois recalled picking up the above-described individual between 6 and 6:30 a.m. on Feb-

ruary 14, but Middletown Taxi records revealed that Sirois actually picked up his first fare at 7 a.m. Because of that discrepancy, and because no further leads developed, the Sirois lead was dropped. (Id.)

### (2) Bowman's Incarceration

Bowman arrived at the Orange County Correctional Facility on the night of February 14. The jail classifies each incoming inmate to determine his relative security risk, based upon criminal history, disciplinary behavior, escape history, bail, crime charged, detainer, identification, and an individual assessment. (Affidavit of Theodore J. Catletti ¶ 7). Bowman scored a 27, placing him in the category of maximum security risk. His score was based on what Theodore Catletti, the Orange County Jail Administrator, identified as Bowman's significant criminal history, including violent felonies, assaultive behavior, prior escape attempts, prior suicide attempts, and the fact that Bowman had been remanded without bail. (Id. at ¶ 8.) Because of his high score, Bowman was referred for screening to Mental Health Services, which recommended "close watch." (Id. at ¶ 11.) Accordingly, Bowman was assigned to Unit 3 in a special housing area called "U Tier," consisting of a single cell in a row of six; the U Tier allows for direct supervision of each cell by a corrections officer at all times. (Id.) Inmates in U Tier units are permitted to leave their cells for the same reasons as inmates in the general jail population—i.e., to receive medical attention or to go to the recreation yard—and receive meals in their cells. (Id. at ¶ 14.)

Food and other services at the Orange County Jail are provided under contract by Aramark Correctional Services, Inc. Sarah Syfor, an Aramark employee whose duties include commissary services at the jail, is responsible for distributing commissary order sheets to the inmates each Wednesday, and picks up the completed sheets with orders for the following week on Friday. (Affidavit of Sarah R. Syfor

¶ 3.) Once an order is received, Syfor checks with the jail's records department to find out whether the inmate is cleared to receive the ordered items and has sufficient funds in his account to pay for them.

On February 20, 1998, Bowman submitted a commissary form for the first time, ordering one pack of cigarettes and a haircut; according to Syfor, the order would normally have been filled by February 26. (Syfor Aff. ¶ 6; Commissary Order Form, attached as Exhibit A to Syfor Aff.) Syfor states that she received a phone call from Administration (but does not specify the individual who made the call) on February 26 or 27, telling her that, in accordance with a request from the District Attorney, Bowman was not permitted to receive a haircut because the District Attorney might need a hair sample from Bowman. The caller then mistakenly instructed her to freeze Bowman's commissary account. (Id. ¶ 7.) Bowman received a credit for his attempted purchase.

On February 27, Bowman sent Catletti a note that read:

Colonol [sic] Catteletti

Who do you think you are telling commissary and record [sic] don't give bowman no smokes and freeze my account.

Who you supose [sic] to be god jesus you know let me know.

I will see you or whomever in court.

I can't recive [sic] tobacco who in the hell do you people think you are.

(Note from Bowman to Catletti, attached as Exhibit C to Catletti affidavit.)

Catletti denies ever having ordered that Bowman be denied commissary privileges. (Id. ¶ 16.) In response to Bowman's note, however, he issued an Administrative Order that Bowman be placed on extreme close watch, which included an order to have Bowman cuffed and shackled at all times when Bowman was outside his cell. Catletti stated that he based his decision on his assessment, in light of his professional experience, that the note indicated

that Bowman posed a safety risk, either to himself or a corrections officer, and required protective action. (Id. at ¶ 12.) Cuffs and shackles are used only when an inmate is outside his cell; the cuffs and shackles are removed once the inmate returns to his housing unit. (Id. at ¶ 13.) Bowman was outside his cell for one hour each day, when he was permitted to go to the recreation yard.

Syfor processed a second commissary order from Bowman on March 3, for coffee, candy, snacks, and cigarettes. (Commissary Order Form, attached as Exhibit C to Syfor Aff.) Syfor states that on that date, at about 1:45 p.m., she filled Bowman's February 20 order for cigarettes. Approximately one hour later, she avers that she received another phone call from an unidentified individual in Administration telling her that Bowman's account was frozen and that he was not to receive commissary, but that the restriction was lifted two minutes later, at which time she filled Bowman's order. (Syfor Aff. ¶ 10; Commissary Order Receipts, attached as Exhibit D to Syfor Aff.)

*(3) Later Events*

The record submitted by the parties provides little detail about subsequent events. According to a newspaper article submitted by Lucarelli, during the period of Bowman's incarceration, 11 eyewitnesses failed to pick out Bowman from a lineup, and the police were unable to obtain any physical evidence linking Bowman to the crimes. (Times–Herald Record article dated April 11, 1998, attached as Exhibit K to Lucarelli Notice of Motion.) On March 4, Anthony Grayson was charged with the murder of Molly Cosgrove, an Orange County grand jury voted "no true bill" as to the case against Bowman, and Bowman was released from jail. Grayson was tried for the crimes and convicted on January 22, 1999.

Bowman filed the instant action on February 9, 1999. He claims the following: (1) that he was falsely arrested when Gillespie and Lucarelli asked Bowman to ride back to the station with them in violation of 42 U.S.C. § 1983 and the Fourth, Fifth, Eighth and Fourteenth Amendments; (2) that the Defendants falsely imprisoned him in violation of those same provisions; (3) that the Defendants maliciously prosecuted him under § 1983 and the Fourth, Fifth, Eighth, and Fourteenth Amendments by keeping him in jail after learning that the charges against Bowman were false; and (4) that the Defendants conspired to deprive Bowman of his First, Eighth, and Fourteenth Amendment rights in violation of 42 U.S.C. §§ 1985 and 1986 by depriving him of commissary privileges and cuffing and shackling him during his incarceration. All Defendants have moved for summary judgment. For the reasons that follow, I deny the motions of Gillespie and Lucarelli for summary judgment on Bowman's false arrest claim, and grant their motions with respect to all other claims. The motions of the Middletown and Orange County Defendants are granted in their entirety.

*CONCLUSIONS OF LAW*

*Standards for Summary Judgment*

Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-movant. *See Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505. In making its determination, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *See id.* at 255, 106 S.Ct. 2505. To defeat summary judgment, the non-moving party must go beyond the pleadings and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### I. False Arrest

■ Bowman bases his false arrest claim on violations of the Fourth, Fifth, Eighth, and Fourteenth Amendments. As Orange County correctly points out, the Eighth Amendment cannot serve as a basis for this claim: the Eighth Amendment right to be free from cruel or unusual punishment applies only to the post-conviction stage. *See Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Here, Bowman was a pretrial detainee during the entirety of his incarceration. Thus, the Fourth and Fourteenth Amendments are the only grounds for Bowman's false arrest claim.

■ The elements of a claim of false arrest under § 1983 are "substantially the same" as the elements of a false arrest claim under New York law. *See Hygh v. Jacobs*, 961 F.2d 359, 366 (2d Cir.1992). Under New York law, "a plaintiff claiming false arrest must show, *inter alia*, that the defendant intentionally confined him without his consent and without justification." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir.1996). "There is no 'bright line' rule differentiating an arrest from [other lesser detentions] supportable by less than probable cause." *Posr v. Doherty*, 944 F.2d 91, 98–99 (2d Cir.1991). Rather, the question is when the individual was restrained and his freedom of movement limited to the point where he did not feel free to leave. *See id.*

■ The existence of probable cause to arrest is a complete defense to a false arrest claim under § 1983. *See Weyant*, 101 F.3d at 852. "Courts evaluating probable cause must consider those facts available to the officer at the time of the arrest and immediately before it." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569 (2d Cir.1996). Probable cause exists when there are "facts and circumstances 'sufficient to warrant a prudent man that the

[suspect] had committed or was committing an offense.'" *Id.* (quotations omitted).

### (1) False Arrest as to Gillespie and Lucarelli

#### (a) Arrest

■ The only point in time at which Bowman alleges he was falsely arrested was at 9:50 a.m. on February 14, when he was approached by Gillespie and Lucarelli at Tuckerman Hall. As noted above, the facts surrounding that encounter are sharply disputed. Gillespie and Lucarelli testified that one of them asked Bowman to go with them to the station (Lucarelli claims that Gillespie made the request), that Bowman agreed, and that Bowman got into Lucarelli's car on his own. Bowman, on the other hand, testified that the detectives told him that he was under arrest, and that he was handcuffed when he entered the car. The conflicting testimony raises a question of fact as to whether a reasonable person in Bowman's situation would have felt free to leave at that point.

#### (b) Probable Cause

The existence of probable cause is relevant only if Bowman was arrested at Tuckerman Hall on the morning of February 14, as he alleges. If Bowman was not arrested until he confessed at the station house, the probable cause issue is irrelevant, because, as discussed below, his confession supplied probable cause for his arrest at that juncture. The question of whether there was an arrest is for the jury. However, I will assume *arguendo* that Bowman was arrested so that I can evaluate Gillespie's claim that there was probable cause to arrest Bowman at Tuckerman Hall.

#### (i) Gillespie

■ At his deposition and at the Grayson trial, Gillespie gave conflicting testimony with respect to what he knew about the suspect before Gillespie arrived at Tucker-

man Hall. In his deposition, Gillespie stated that the description provided to him by Lieutenant Napoli was of a black male wearing a dark coat. But at the Grayson trial, Gillespie testified that the suspect was described to him as a "black male wearing a navy jacket with a wool hat." Gillespie testified at his deposition that when he first saw Bowman, Bowman had blood on his person and was wearing a "dark windbreaker-type jacket;" at the trial, he described Bowman's outerwear as "a light windbreaker, gray with, I believe, the color of blue in it." Moreover, at the trial, Gillespie described Bowman as being of small stature and weighing about 145 pounds, and admitted that Bowman did not match the description he had been given.

In sum, it is apparent to this Court that Gillespie has given different accounts of the initial encounter with Bowman at different times when his interests varied. At the trial, his objective was the conviction of Grayson; at his deposition, it was to establish qualified immunity for himself. If Gillespie's trial testimony is to be believed, Bowman was some fifty pounds lighter and wearing a garment of a different color than the suspect as described to Middletown police. Gillespie's inconsistent testimony raises questions of fact with respect to what he knew about the suspect before going to Tuckerman Hall, and whether Bowman sufficiently matched the description provided to Gillespie to support probable cause to arrest.[2]

*(ii) Lucarelli*

Lucarelli testified that Bowman was bleeding when Lucarelli arrived at Tuckerman Hall. Lucarelli's deposition contains no further detail about the description provided to him, or whether Bowman matched that description. In fact, there is no evi-

dence tending to show that Lucarelli had probable cause or did not have probable cause at that point. And in his Memorandum of Law, Lucarelli conceded that any arrest at Tuckerman Hall "was obviously without probable cause since there was nothing to tie him to the crimes beyond broad similarities with witness descriptions and his wound." (Lucarelli Br. at 3.)

 Lucarelli's concession is not dispositive, as the probable cause determination is made from the objective viewpoint of a reasonable officer, not the subjective perception of the officer on the scene. *See Ornelas v. United States,* 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). However, there is no evidence in the record before me from which a reasonable trier of fact could ascertain what, if anything, Lucarelli knew—i.e., learned from Bowman or others at the point when he accompanied Bowman back to the station house. I therefore cannot conclude that Lucarelli is entitled to judgment as a matter of law on this issue. That determination must abide the trial.

*(c) Qualified Immunity*

 Even in the absence of probable cause to arrest, a police officer is nonetheless immune from a false arrest claim "if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Posr v. Court Officer Shield # 207,* 180 F.3d 409, 416 (2d Cir.1999) (quoting *Golino v. City of New Haven,* 950 F.2d 864, 870 (2d Cir. 1991)). Both detectives assert that even if probable cause was lacking, they are entitled to qualified immunity.

---

**2.** Both detectives have referred the Court to two investigation reports of security officers at Tuckerman Hall, which state that Bowman said that he had left the shelter and "smoked pot" during the night. (Investigation Reports, attached as Exhibits A and B to Lucarelli Notice of Motion.) These reports are of

no moment to the probable cause analysis, however, because there is no indication that either Gillespie or Lucarelli knew of this statement when they approached Bowman in Tuckerman Hall. Nor would they alter the conclusion in any event, in view of the discrepancies in Gillespie's testimony.

■ Because there are disputed issues of fact concerning the probable cause determination, however, the defense of qualified immunity must also be submitted to the jury. *See Kim v. Hurston,* 182 F.3d 113, 120 (2d Cir.1999) (citing *Hunter v. Bryant,* 502 U.S. 224, 227–28, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)). Summary judgment on Bowman's false arrest claims must therefore be denied to Gillespie and Lucarelli.

### (2) False Arrest as to the Middletown Defendants

Bowman also asserts false arrest claims against Middletown Mayor DeStefano, the City of Middletown, and the Middletown Police Department.

■ To recover against a municipality in a Section 1983 action, the plaintiff must establish that (1) the municipality had a policy or custom that was responsible for the alleged deprivation of constitutional rights, or (2) that a failure of supervision or lack of training is "so severe as to reach the level of 'gross negligence' or 'deliberate indifference' to the deprivation of plaintiff's constitutional rights." *Monell v. Dept. of Social Servs. of the City of New York,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Bowman has not alleged that any of the Middletown Defendants maintained a policy of arresting individuals without probable cause, or that the supervision or training of Middletown detectives was somehow deficient. Thus, under *Monell,* it would appear that Bowman cannot make out a claim against Middletown.

■ However, municipal liability may also be imposed where a final policymaker of the municipality is personally responsible for the constitutional violation. *See McMillian v. Monroe County,* 520 U.S. 781, 784–86, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997). A final policymaker is an official of a municipality who "speak[s] with final policymaking authority" for the municipality "in a particular area, or on a particular issue." *Id.* at 785, 117 S.Ct. 1734. The question of who qualifies as a final policymaker is one of state law. *See City of St. Louis v. Praprotnik,* 485 U.S. 112, 123, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (citing *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)).

■ Bowman argues that he has made an adequate showing that his arrest resulted from the decisions of relevant policymakers, based on his allegations that Detective Sergeant DeRosa was one of the supervisors responsible for the investigation, was present during Bowman's interrogation, and suggested some of the details provided in Bowman's confession. DeRosa, however, was only the ranking officer present at Bowman's questioning; he was not a final policymaker for the Middletown Police Department. Under the Middletown City Charter, the Police Commission is the final policymaking body for law enforcement. *See* Middletown City Charter, Title VII, §§ 127–129. As the Middletown Defendants note, Bowman has made no showing that any decision of the Police Commission led to his arrest, or that Mayor DeStefano (the only individual among the Middletown Defendants) was a final policymaker, as the Supreme Court has delineated that term. (Bowman's allegations with respect to Mayor DeStefano are relevant only to his malicious prosecution claim.) In view of his failure to establish a basis for municipal liability, Bowman's false arrest claims against the Middletown Defendants are dismissed.

### (3) False Arrest as to the County Defendants

Bowman was concededly arrested by the Middletown Police. There is no evidence that any representative of Orange County took part in his arrest.[3] Therefore, the

---

**3.** Indeed, in response to the County's Interrogatories, which requested that Bowman

false arrest claim against the County Defendants is dismissed.

## II. False Imprisonment

■ As the Second Circuit has noted, for Section 1983 purposes, false imprisonment is merely a species of false arrest. *See Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2d Cir.1995). "False imprisonment is simply an unlawful detention or confinement brought about by means of an arrest rather than in some other way and is in all other respects synonymous with false arrest." *Covington v. City of New York,* 171 F.3d 117, 125 (2d Cir.1999) (Glasser, J., dissenting). Thus, to the extent that Bowman's second claim purports to state a cause of action for false imprisonment against Gillespie and Lucarelli, it is dismissed as duplicative, and against the Middletown Defendants, it is dismissed as without merit on the grounds discussed above.

■ Orange County and Catletti unquestionably were involved in Bowman's imprisonment, given that he was remanded to the Orange County Jail per order of the Court. No claim of false imprisonment lies against a defendant, however, for accepting and housing a prisoner pursuant to a lawful remand of a court. *See* 59 N.Y. Jur.2d, *False Imprisonment and Malicious Prosecution* §§ 23, 24 (1987). Therefore, this claim is dismissed against the County Defendants as well.

## III. Malicious Prosecution

■ To succeed on a claim for malicious prosecution, the plaintiff must show (1) that the defendant started a criminal proceeding against him; (2) that the proceeding terminated in the plaintiff's favor; (3) that there was no probable cause for the proceeding; and (4) the proceeding was instituted with malice. *Lowth,* 82 F.3d at 571.

specify, *inter alia,* "each and every act of Joseph G. Rampe that allegedly deprived Plaintiff of his liberty by wantonly, maliciously and falsely arresting Plaintiff," Bowman

### (1) Malicious Prosecution as to Gillespie and Lucarelli

Gillespie and Lucarelli do not dispute that the first two of these elements are met. As for the first, the record reveals that two felony complaints were sworn out against Bowman. Under New York law, the filing of a felony complaint initiates a criminal proceeding. *See People v. Osgood,* 52 N.Y.2d 37, 43, 436 N.Y.S.2d 213, 417 N.E.2d 507 (1980). With respect to the second element, the proceeding against Bowman was undisputedly terminated in his favor when the grand jury voted no true bill.

■ I therefore turn to the third element: lack of probable cause. The detectives contend that Bowman's confession established probable cause. I agree. Although Detective DeRosa may have supplied Bowman with the knowledge that there was a dog at one of the crime scenes, Gillespie's testimony establishes that Bowman provided most of the details contained in his confession (e.g., the names of the streets where the robberies took place, the gender and other physical characteristics of his victims, nature of the items stolen). Though subsequent investigation revealed these to be fabrications, the only question for the court is whether, at the time that Bowman confessed, Bowman's confession provided Gillespie and Lucarelli with probable cause to charge Bowman with the crimes. *See Lowth,* 82 F.3d 563. Given the length of the confession and the amount of detail contained in Bowman's statement, I conclude that his confession was more than sufficient to provide probable cause to believe that probable cause existed to initiate the prosecution against him. Moreover, while probable cause can be eliminated by evidence that surfaces after charges are filed, *see id.,* Bowman has made no show-

answered only, "Concededly, Mr. Rampe did not arrest Mr. Bowman." (Plaintiff's Response to Interrogatories, attached as Exhibit D to Affidavit of Susan Z. Stockburger.)

ing that the detectives became aware of any intervening facts that might have rendered the charges against Bowman groundless before the grand jury acted.

 Bowman argues that because there are numerous disputed facts surrounding the manner in which Gillespie and Lucarelli obtained his confession—i.e., Bowman's testimony that he was coerced by the detectives' threats to implicate him in other crimes, accusatory and suggestive questioning, and refusal to provide him with counsel—precludes a finding on summary judgment that there was probable cause to prosecute.[4] A confession obtained in the manner alleged, Bowman contends, is so inherently unreliable as not to give rise to probable cause.

Bowman has cited no case law to support that proposition. The Court has located only one arguably analogous case. In *Niemann v. Whalen,* 911 F.Supp. 656, 669 (S.D.N.Y.1996), Judge Conner, citing to no authority, ruled that a question of fact about the voluntariness of a confession gave rise to a question of fact about probable cause to prosecute.

 Even if *Niemann* were correct, and even if its reasoning could be extended to a case where the facts concerning voluntariness are far less compelling, I find that the detectives are entitled to qualified immunity. Defendants are qualifiedly immune from liability under § 1983 if "(1) their actions did not violate clearly established law, or (2) it was objectively reasonable for them to believe that their actions did not violate such law." *Warren v. Keane,* 196 F.3d 330, 332 (2d Cir.1999) (citation omitted). The first prong of this test requires courts to determine "whether pre-existing law sufficiently foreshadows the direction it will take such that government officials have reasonable

notice of the illegality of their actions." *Rodriguez v. Phillips,* 66 F.3d 470, 479 (2d Cir.1995). Here, there appears to be only one reported decision—by a lower federal court—to support Bowman's argument that a coerced confession precludes a determination of probable cause to prosecute. However, "a district court decision does not 'clearly establish' the law, even in its own circuit." *Richardson v. Selsky,* 5 F.3d 616, 623 (2d Cir.1993) (citing *Hawkins v. Steingut,* 829 F.2d 317, 321 (2d Cir.1987)). In view of the lack of jurisprudential guidance with regard to Bowman's argument, the detectives are protected by qualified immunity on Bowman's malicious prosecution claim.

### (2) Malicious Prosecution as to the Middletown Defendants

 Bowman alleges that the Middletown Defendants conspired to continue the prosecution against him despite the fact that they knew, or should have known, that there was no merit to the case. In support, Bowman points to the following evidence: the Mayor's admission at his deposition (which is not in the record) that he had brought a lawsuit to shut down the Emergency Housing Shelter; that Middletown Police Chief Ogden informed the Mayor of Bowman's arrest within fifteen minutes of Bowman's arrival at the station house on February 14; Sergeant DeRosa's responsibility for the investigation and presence during Bowman's interrogation; and the Police Department's decision not to credit the report of the taxi driver who claimed to have driven home an individual matching the description of the perpetrator, and to ignore the inconsistency in appearance and clothing between Bowman and the police description.

---

**4.** Bowman also places great weight on his statement to the detectives that they would owe him an apology "if [he] didn't do this." The Court does not. Any inference against a finding of probable cause based on that remark is negated by the high degree of factual detail that Bowman provided in his statement, as well his agreement after signing his confession to ride around Middletown and point out the crime scenes and location of his weapon to the detectives.

Bowman identifies no pattern or practice of meritless prosecutions by the Middletown Defendants, and the only policymaker identified in Bowman's argument is Mayor DeStefano. The fact that DeStefano was promptly informed by the Chief of Police of an arrest in a case of obvious public concern, or that a lawsuit was pending against the shelter (the significance of which Bowman does not make clear in his brief) does not support an inference that the Mayor made a decision to pursue charges he knew to be baseless. As the Mayor's lawsuit was pending before, and dismissed by, this Court, I am aware of the implied thrust of the Plaintiff's argument, which is that DeStefano, who wanted to close down the shelter because it brought derelicts to the area, would do anything to discredit it. There is no evidence in the record to support this theory. Moreover, at oral argument, Bowman's counsel expressly denied reliance on this theory, and proffered no other reasons for mentioning "the Mayor's lawsuit." Finally, Bowman has provided no evidence to link DeStefano to the decision not to pursue the taxi driver's lead, or to ignore the alleged differences between Bowman and the police description of the suspect. For these reasons, Bowman's malicious prosecution claim against the Middletown Defendants is dismissed.

### (3) Malicious Prosecution as to the County Defendants

Bowman has made no showing that any of the County Defendants engaged in any action to perpetuate the charges against him or otherwise related to those charges. The malicious prosecution claim against them is therefore dismissed as well.

### IV. Deprivation of Bowman's Civil Rights in Prison

Finally, Bowman has asserted claims against all Defendants under 42 U.S.C.

§§ 1985 and 1986 for violations of his First, Eighth, and Fourteenth Amendment rights, stemming from the temporary denial of his ′ commissary privileges and Jail Administrator Catletti's order to have Bowman shackled in response to Bowman's written complaint to Catletti. Bowman alleges that the freezing of his commissary account and placing him in shackles and cuffs was the object of a conspiracy between Catletti, Orange County Executive Rampe, and other unnamed Orange County employees.

Bowman presumably brings his claim under subsection (3) of § 1985,[5] which provides:

> If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws ... the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

Section 1986 provides in pertinent part:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in Section 1985 of this title, are about to be committed, and having the power to prevent or aid in preventing the commission of the same, neglects or refuses to do so, if such wrongful act be committed, shall be liable to the party injured ... for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented ....

A conspiracy claim under § 1985 is actionable "only if it involves a discriminatory animus based on race or some oth-

---

**5.** In his Complaint, Bowman did not specify the subsection of § 1985 upon which he based his claim. Subsection (1), which deals with conspiracies to prevent federal officials from carrying out their duties, and subsection

(2), which relates to obstruction of justice and intimidation of parties, witnesses, and jurors, are irrelevant to Bowman's allegations. Therefore, he can only be relying on subsection (3), under which I address his claim.

er invidious classification." *Posr v. Court Officer Shield # 207*, 180 F.3d 409, 419 (2d Cir.1999). Bowman has come forth with no evidence whatsoever that any treatment to which he was subjected at the Orange County Jail was motivated by discriminatory intent based on his race or any other impermissible classification. His § 1985 claim therefore cannot survive summary judgment. His § 1986 claim shares the same fate, since a § 1986 claim cannot lie in the absence of a sustainable § 1985 claim. *See Gagliardi v. Village of Pawling*, 18 F.3d 188, 194 (2d Cir.1994).

Additionally, Bowman has failed to demonstrate the existence of a conspiracy, as § 1985 requires. He has not disputed Catletti's statement in his affidavit that Catletti did not order the freeze on Bowman's commissary account, and he has pointed to no evidence to support his allegation of a conspiracy between County Executive Rampe and Catletti, or other unnamed employees of Orange County. There is not even any evidence that Rampe and Catletti conversed about Bowman while he was incarcerated. Thus, to the extent that Bowman brings this claim under the civil rights conspiracy statute, his claims under §§ 1985 and 1986 must be dismissed.

■ In his brief in opposition to summary judgment, however, Bowman argues his jail-related claims as though they were plead under § 1983, rather than § 1985. Where a plaintiff invokes a dubious legal theory in his complaint but shifts to a more tenable position in his brief opposing summary judgment, the court may treat the plaintiff's revised theory of the case as a motion to amend the pleadings pursuant to Fed.R.Civ.P. 15(a). *See* 6 Wright, Miller, and Kane, *Federal Practice and Procedure:* Civil 2d § 1474 (1990). Accordingly, I analyze Bowman's claim relating to his incarceration as though it were brought under § 1983.

*(1) Prison Claims as to Gillespie, Lucarelli and the Middletown Defendants*

Bowman's assertion of these claims against Gillespie, Lucarelli, and the Middletown Defendants is puzzling, as he has not alleged that any of them played a role in the acts to which he was subjected in the Orange County Jail. Moreover, the evidence is undisputed that they had nothing to do with what happened to him in the jail. The fact that Gillespie and Lucarelli put Bowman in jail does not make them responsible for what happened to him once he arrived there. Bowman's incarceration-based claims against these Defendants are therefore dismissed.

*(2) Prison Claims as to the County Defendants*

Bowman has made no showing of any pattern or practice on the part of Orange County of engaging in the constitutional deprivations he alleges. Nor has he alleged that any final policymaker made any decision that resulted in Bowman's being cuffed and shackled. Accordingly, his claims related to his incarceration are dismissed against Defendants Orange County and County Executive Joseph Rampe. I address only his remaining claim against Jail Superintendent Catletti.

The Eighth Amendment, which applies only to post-conviction violations, is inapplicable to Bowman's claims, since those claims arise solely from Bowman's status as a pretrial detainee. *See Graham*, 490 U.S. at 386 n. 6, 109 S.Ct. 1865. That leaves the First and Fourteenth Amendments as grounds for his maltreatment claims against Catletti.

*(a) Denial of Commissary Privileges*

The County argues first that Bowman's constitutional claims must fail because the record demonstrates that Bowman was not denied commissary privileges. This characterization is inaccurate: the evidence shows that a freeze was placed on Bowman's commissary account for five days,

and, that he was unable to place any orders during that time.

■ That leaves the question of whether the denial of commissary privileges for five days, without a hearing, resulted in a due process violation. With respect to restrictions on inmates, "[t]here is, of course, a *de minimis* level of imposition with which the Constitution is not concerned." *Bell v. Wolfish*, 441 U.S. 520, 539 n. 21, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (quoting *Ingraham v. Wright*, 430 U.S. 651, 674, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977)). I find that the freeze on Bowman's account was such an imposition. The only deprivation suffered by Bowman was the inability to order cigarettes (the only item he wanted) for five days, after which he again enjoyed use of the commissary. This prong of Bowman's claim against Catletti is dismissed.

### (b) *Catletti's Order to Place Bowman in Cuffs and Shackles*

#### (i) *First Amendment Retaliation*

■ The County argues that Bowman's First Amendment retaliation claim—i.e., that Catletti ordered that he be shackled in retaliation for sending the note by terminating his commissary privileges—fails because Bowman has not come forward with evidence of improper motive by the County. To sustain a retaliation claim, a plaintiff must demonstrate "that he engaged in constitutionally protected conduct and that 'the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff.' " *Hynes v. Squillace*, 143 F.3d 653, 657 (2d Cir.1998) (citation omitted), *cert. denied*, 525 U.S. 907, 119 S.Ct. 246, 142 L.Ed.2d 202 (1998). If the plaintiff meets his initial burden, "the defendants must show by a preponderance of the evidence that they would have disciplined the plaintiff 'even in the absence of the protected conduct.' " *Id.* (citation omitted).

■ Neither party has briefed the question of whether Bowman's note amounted to constitutionally protected speech. The right of a prisoner to seek judicial or administrative redress for conditions of confinement is well established in federal jurisprudence, *see Lewis v. Casey*, 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996), as is the right to be free from retaliation for seeking such redress. *See Babcock v. White*, 102 F.3d 267, 276 (7th Cir.1996) (citations omitted); *Penrod v. Zavaras*, 94 F.3d 1399, 1404–05 (10th Cir.1996). The issue of judicial redress is irrelevant here, since Bowman made no attempt to petition the courts while he was incarcerated. Whether his note to Catletti amounts to an attempt to secure administrative relief, however, is less clear. The County has not cited—nor has this Court been able to locate—any Supreme Court or federal circuit decision establishing, as a form of seeking "administrative redress," a right to make written complaint to prison administrators. If anything, the case law can be read to suggest that the administrative remedies for which an inmate enjoys a First Amendment right of petition are limited to those set forth under state administrative law, such as sending a complaint to a state bureau of prisons, as opposed to informal or intra-prison complaints, such as the note Bowman sent to Catletti in this case. *See, e.g., Trobaugh v. Hall*, 176 F.3d 1087 (8th Cir.1999) (grievance filed with county deputy); *Babcock*, 102 F.3d at 269 (state bureau of prisons); *Nicholson v. Moran*, 961 F.2d 996 (1st Cir.1992) (state corrections authority); *Wright v. Newsome*, 795 F.2d 964 (11th Cir.1986) (state claims advisory board).

I need not decide the issue, however, because, even if Bowman's note were constitutionally protected speech, I find that Catletti is entitled to qualified immunity. Given the ambiguity, discussed above, surrounding the question of whether Bowman's note fell within the parameters of the First Amendment, it cannot be said that the constitutional right of which Bow-

man claims to have been deprived was so clearly established as to give Catletti notice that his action was unconstitutional.

Catletti also satisfies the alternative prong of the qualified immunity analysis. The Supreme Court has long since determined that, with respect to substantive due process violations under the Fourteenth Amendment, for a condition or restriction imposed by prison officials during pretrial detention to be actionable, the plaintiff must demonstrate that the action "is not reasonably related to a legitimate goal," but is imposed as a mere punishment. *Bell,* 441 U.S. at 539, 99 S.Ct. 1861. The Court further admonished in *Bell* that "[p]rison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain internal security." *Id.* at 547, 99 S.Ct. 1861. Questions of prison security "are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Id.* at 548, 99 S.Ct. 1861 (citation omitted). Given that Catletti need only demonstrate that his decision to order Bowman shackled was reasonably related to a legitimate goal—in this case, the maintenance of prison security—I conclude that it was objectively reasonable for Catletti to conclude that his order was constitutionally permissible.

*(ii) Substantive Due Process*

Again, viewing Bowman's claims under the standards articulated in *Bell,* Catletti has provided a legitimate reason for his order to have Bowman cuffed and shackled. Catletti stated in his affidavit that his order was based on his professional experience and opinion that Bowman's note indicated that Bowman posed a poten-

tial threat to Catletti and to other corrections officers. Admittedly, it is not evident at first blush why a note from an inmate complaining about denial of commissary privileges should necessitate placing its author in handcuffs and shackles, even in light of that inmate's psychiatric and criminal history. Nevertheless, the Supreme Court has made clear that courts are to accord a high degree of deference to the expertise of prison officials with respect to security matters. In view of that standard, and Bowman's failure to adduce evidence suggesting that there was no logical nexus between the restrictions placed upon him and the prison's interest in security, I cannot conclude that Bowman has met his burden under *Bell* with respect to the use of shackles and cuffs.

*Conclusion*

For the foregoing reasons, summary judgment is (1) denied with respect to the false arrest claims against Defendants Gillespie and Lucarelli; (2) granted with respect to the false arrest claims against the Middletown and County Defendants; (3) granted on the false imprisonment claims as to all Defendants; (4) granted on the malicious prosecution claims as to all Defendants; and (5) granted on the claims of mistreatment in prison as to all Defendants.